**THIRD DIVISION**
**GOBEIL,**
**COOMER AND HODGES, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**March 5, 2019**

# In the Court of Appeals of Georgia

A18A2108. BLAIR v. PANTERA ENTERPRISES, INC.

COOMER, Judge.

Pantera Enterprises, Inc. ("Pantera") sued Stephen Blair seeking injunctive relief due to his alleged violation of a non-compete agreement. The trial court granted injunctive relief to Pantera. On appeal, Blair contends that the trial court erred (1) by granting injunctive relief to Pantera and (2) by holding that the non-compete agreement at issue is enforceable against him based on its conclusion that he is a "key employee" as defined in Georgia's Restrictive Covenants Act, OCGA § 13-8-50, et seq. (the "Act"). For the following reasons, we reverse.

"We apply an abuse of discretion standard in reviewing a trial court's grant of a permanent injunction, unless the question to be decided by the trial court is one of law." *Black Island Homeowners Ass'n v. Marra*, 274 Ga. App. 265, 266 (1) (617

SE2d 148) (2005) (footnotes and punctuation omitted). Where the issue to be decided is one of law, the de novo standard of review applies. *Id. See generally Jordan v. State*, 322 Ga. App. 252, 255-256 (4) (a) (744 SE2d 447) (2013).

The record shows that Pantera bought J. T. Industrial Contractor ("J. T. Industrial") in 1999 and continues to do business under that name. J. T. Industrial provides track-maintenance services to businesses that have railroad tracks on their property ("industry customers"). While Blair was employed there, J. T. Industrial also provided track-maintenance services to railroad companies, including Norfolk Southern Railway Company ("Norfolk Southern"). The track-maintenance services for Norfolk Southern typically consisted of providing a backhoe, a backhoe operator, a dump truck, and a dump truck driver.

Blair began working for J. T. Industrial in 1993 as a laborer supporting a backhoe operator. Blair wanted to learn to operate a backhoe, so whenever the backhoe operator he supported was not using the backhoe, Blair would get on the backhoe and "play" with it. He would get on the backhoe every time he had a chance. Blair did not necessarily need to be on the railroad track to learn to operate the backhoe. He could also be off the track picking up railroad ties or practicing other tasks. There were times when he used the backhoe to practice without his supervisor

2

being present. As Blair began to be able to operate the backhoe, the experienced backhoe operator allowed him to do some work including putting in railroad ties. Until he was designated as a backhoe operator by J. T. Industrial, however, Blair was not allowed to operate a backhoe for J. T. Industrial's railroad customers except under the supervision and direction of an experienced backhoe operator. Blair left J. T. Industrial in 2002 and returned in 2007.

When Blair returned in 2007, he was assigned to a crew working for industry customers for a brief period so that J. T. Industrial could observe his work and make sure that his skills as a backhoe operator had not eroded. Blair was then reassigned to railroad work. From 2007 to 2017, Blair was primarily assigned to perform backhoe services for Norfolk Southern in its Gordon Territory, which includes the Norfolk Southern railroad lines that run from Gordon to Eatonton, from Macon to Shady Dale, from Macon to Tennille, and from Tennille to Dublin. As a backhoe operator, Blair supervised the truck driver assigned to him.

Blair's only jobs at J. T. Industrial were being a backhoe operator or a laborer. Blair did not have the authority to hire or fire people. He did not regularly direct the work of anyone other than his truck driver. Blair was never asked to make sales to Norfolk Southern or any other customer. He was never given a customer list. Blair

never made a sales pitch to Norfolk Southern about who it should use in the Gordon Territory. He never negotiated with Norfolk Southern about who was going to work in any particular territory. Blair was not involved in negotiating contracts with Norfolk Southern.

In 2012, Pantera required Blair to sign a non-compete agreement in order to continue being assigned to Norfolk Southern. Under the terms of the non-compete agreement, Blair agreed that he would not operate a backhoe on railways owned or leased by Norfolk Southern in its Georgia Operating Division for any entity or person for a two-year period after ending his employment with Pantera.

In 2017, Blair was being paid $13 per hour. He had asked J. T. Industrial's general manager for a raise, but the general manager told him that "obviously operating a backhoe for the railroad was going to limit his ability to move forward with the company" and that he would need to take on more responsibility to get a raise.

In April of 2017, Blair notified Pantera that he would be leaving the company. Blair began working for Southern Design Materials, Inc. ("SDM") for $20 per hour. As a result, Norfolk Southern redirected its track-maintenance business for the Gordon Territory from Pantera to SDM. Pantera assured Norfolk Southern that it had

4

another backhoe operator available and that it could continue to provide a backhoe operator and a truck driver. However, Norfolk Southern's track supervisor for the Gordon Territory, who supervised backhoe operators, did not believe that Pantera had a good replacement for Blair. The track supervisor considered Blair a good backhoe operator who was reliable and came to work everyday. He wanted to use Blair because he was effective, safe, and reliable. The track supervisor testified that there are few good backhoe operators who have good attitudes and are reliable. Pantera has not done any work for Norfolk Southern in the Gordon Territory since April of 2017.

Pantera filed a complaint on May 26, 2017, seeking to enjoin Blair from operating a backhoe for Norfolk Southern in the Gordon Territory for the two-year period provided in the non-compete agreement. The trial court granted Pantera the requested injunctive relief, and this appeal followed.

Both of Blair's enumerations of error are based on his argument that the trial court erred in holding that Blair was a "key employee" as defined in the Act.

The trial court held that Blair "by virtue of his reputation and the period of time within which he obtained his training and skill should be considered a 'key employee.'" Blair argues that the trial court applied the definition of "key employee" in OCGA § 13-8-51 (8) in an overly expansive manner, and that the trial court erred

in holding that Blair, a backhoe operator who learned to operate a backhoe while on the job and who earned $13 per hour, was a key employee. We agree. To interpret OCGA § 13-8-51 (8) to include Blair as a key employee would create an unintended restriction on trade and run counter to the balance the legislature sought to create by limiting the application of the Act.

"[T]he cardinal rule to guide the construction of law is, first, to ascertain the legislative intent and purpose in enacting the law, and then to give it that construction which will effectuate the legislative intent and purpose." *City of Jesup v. Bennett*, 226 Ga. 606, 608 (2) (176 SE2d 81) (1970) (citation and punctuation omitted).

> In the Act, the General Assembly recognizes that "reasonable restrictive covenants contained in employment and commercial contracts serve the legitimate purpose of protecting legitimate business interests. . . ." OCGA § 13-8-50. Further, the General Assembly expressed its intent "to provide statutory guidance so that all parties to such agreements may be certain of the validity and enforceability of such provisions and may know their rights and duties according to such provisions." *Id.*

*Kennedy v. Shave Barber Co., LLC*, ___ Ga. App. ___ (822 SE2d 606) (2018).

Consistent with the legislature's stated intent to provide reasonableness and certainty, the Act specifically limits the types of employees who can be bound by non-compete agreements:

6

[E]nforcement of contracts that restrict competition after the term of employment . . . shall not be permitted against any employee who does not, in the course of his or her employment:

    (1) Customarily and regularly solicit for the employer customers or prospective customers;

    (2) Customarily and regularly engage in making sales or obtaining orders or contracts for products or services to be performed by others;

    (3) Perform the following duties:

        (A) Have a primary duty of managing the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;

        (B) Customarily and regularly direct the work of two or more other employees; and

        (C) Have the authority to hire or fire other employees or have particular weight given to suggestions and recommendations as to the hiring, firing, advancement, promotion, or any other change of status of other employees; or

    (4) Perform the duties of a *key employee* or of a professional.

OCGA § 13-8-53 (a) (Emphasis supplied).

The Act defines "employee" to include any person "in possession of selective or specialized skills, learning, or abilities or customer contacts, customer information, or confidential information who . . . has obtained such skills, learning, abilities, contacts, or information by reason of having worked for an employer." OCGA § 13-8-51 (5). The Act specifically provides that the term "employee" "shall not include any

7

employee who lacks selective or specialized skills, learning, or abilities or customer contacts, customer information, or confidential information." OCGA § 13-8-51 (5). The Act does not define "selective or specialized skills, learning, or abilities."

The term "key employee" is defined in the Act as

an employee who, by reason of the employer's investment of time, training, money, trust, exposure to the public, or exposure to customers, vendors, or other business relationships during the course of the employee's employment with the employer, has gained a high level of notoriety, fame, reputation, or public persona as the employer's representative or spokesperson or has gained a high level of influence or credibility with the employer's customers, vendors, or other business relationships or is intimately involved in the planning for or direction of the business of the employer or a defined unit of the business of the employer. Such term also means an employee in possession of selective or specialized skills, learning, or abilities or customer contacts or customer information who has obtained such skills, learning, abilities, contacts, or information by reason of having worked for the employer.

OCGA § 13-8-51 (8).

Our analysis begins with the understanding that the phrase "key employee" in OCGA § 13-8-53 (a) (4) was not intended to include every employee.[1] Rather, OCGA

[1]We note that in *Kennedy*, ___ Ga. App. ___, we did not need to address whether the appellant in that case was a key employee.

§ 13-8-53 (a), by its terms, was intended to limit the applicability of restrictive covenants to certain employees. Reading the definition of "key employee" in OCGA § 13-8-51 (8) in isolation, it is not clear whether the legislature's intent was that both sentences of the definition must apply for an employee to be a "key employee," or if an employee described in the second sentence, but not the first sentence, is a "key employee." However, "in construing the statute as to give effect to the legislative intent a mere segment of the statute should not be lifted out of context and construed without consideration of all the other parts of the statute." *City of Jesup*, 226 Ga. at 609 (2) (citation omitted). In the context of the entire Act, it is clear that both sentences of OCGA § 13-8-51 (8) must apply for an employee to be a "key employee." The legislature's intention to limit the application of the Act to certain employees would be frustrated if we were to construe OCGA § 13-8-51 (8) to mean that any person defined as an employee pursuant to OCGA § 13-8-51 (5) as a result of being in possession of selective or specialized skills, learning, or abilities obtained by reason of having worked for an employer is automatically considered a "key employee." Such an interpretation would violate the fundamental rules of statutory construction by making language mere surplusage. *See Couch v. Red Roof Inns, Inc.*, 291 Ga. 359, 362 (1) (729 SE2d 378) (2012). Thus, we conclude that to be a key

9

employee for purposes of the Act, an employee must meet the requirements of both sentences of OCGA § 13-8-51 (8).

The trial court's holding that Blair "by virtue of his reputation and the period of time within which he obtained his training and skill should be considered a 'key employee'" appears to be based on both sentences of OCGA § 13-8-51 (8). Even if the trial court was correct that Blair was in possession of selective or specialized skills that he obtained by reason of having worked for the Pantera, Blair must also meet the definition in the first sentence of OCGA § 13-8-51 (8) for him to be a "key employee" for purposes of the Act.

The trial court concluded that testimony that Norfolk Southern transferred its track-maintenance business to SDM because Blair left Pantera and started working for SDM supported the idea that Blair had "a high level of notoriety, fame, reputation, or public persona as the employer's representative." However, even if Blair's good reputation with one customer is sufficient for him to have a "high level of notoriety, fame, reputation, or public persona as the employer's representative," he would be a key employee only if his "high level of notoriety, fame, reputation, or public persona as the employer's representative" was gained "*by reason of* the employer's investment of time, training, money, trust, exposure to the public, or exposure to customers,

10

vendors, or other business relationships during the course of the employee's employment with the employer. . . . " OCGA § 13-8-51 (8) (emphasis supplied.)

Here, Blair was Norfolk Southern's preferred backhoe operator for the Gordon Territory because of his positive attitude, reliability, and proficiency. Blair gained his good reputation with Norfolk Southern due to his work ethic and personal attributes, not by reason of Pantera's investment of time, training, money, trust, exposure to the public, or exposure to customers, vendors, or other business relationships during the course of the Blair's employment with Pantera. Thus, Blair is not a "key employee" as that term is defined in OCGA § 13-8-51 (8). Consequently, the trial court erred in issuing injunctive relief to Pantera.

*Judgment reversed. Hodges, J., concurs. Gobeil, J., concurs in judgment only.\**

**\*THIS OPINION IS PHYSICAL PRECEDENT ONLY. COURT OF APPEALS RULE 33.2 (a).**